FILED
IN THE OFFICE OF THE
CLERK OF SUPREME COURT
MAY 20, 2021
STATE OF NORTH DAKOTA

# IN THE SUPREME COURT
## STATE OF NORTH DAKOTA

### 2021 ND 86

David A. Blasi and Paula J. Blasi, as Trustees
of the Blasi Living Trust, on behalf of themselves
and a class of similarly situated persons,                    Plaintiffs

v.

Bruin E&P Partners, LLC and Bruin E&P Operating, LLC,         Defendants

### No. 20200327

David A. Blasi and Paula J. Blasi, as Trustees
of the Blasi Living Trust, on behalf of themselves
and a class of similarly situated persons,                    Plaintiffs

v.

Lime Rock Resources Operating Co., Inc. and Lime
Rock Resources III-A, L.P.,                                   Defendants

### No. 20200328

David A. Blasi and Paula J. Blasi, as Trustees
of the Blasi Living Trust, on behalf of themselves
and a class of similarly situated persons,                    Plaintiffs

v.

Kraken Development III LLC,                                   Defendant

### No. 20200329

David A. Blasi and Paula J. Blasi, as Trustees
of the Blasi Living Trust, on behalf of themselves
and a class of similarly situated persons,                    Plaintiffs

     v.

Continental Resources, Inc.,                                   Defendant

---
No. 20200330
---

David A. Blasi and Paula J. Blasi, as Trustees
of the Blasi Living Trust, on behalf of themselves
and a class of similarly situated persons,                    Plaintiffs

     v.

EOG Resources, Inc.,                                          Defendant

---
No. 20200331
---

Certified Question of Law from the United States District Court for the District of North Dakota, the Honorable Peter D. Welte, Chief Judge.

CERTIFIED QUESTION ANSWERED.

Opinion of the Court by Jensen, Chief Justice, in which Justice Crothers, McEvers, and Tufte joined. Surrogate Judge Nelson filed a dissenting opinion.

Rex A. Sharp (argued), Prairie Village, KS, Isaac L. Diel (appeared), Charles T. Schimmel (appeared), and Gregory M. Bentz (appeared), Overland Park, KS, and Michael S. Montgomery (appeared) and Kyle G. Pender (on brief), Fargo, ND, for plaintiffs David A. Blasi and Paula J. Blasi.

Matthew J. Salzman (argued), Kansas City, MO, and Paul J. Forster (appeared), and Robin W. Forward (appeared), Bismarck, ND, for defendants Bruin E&P Partners, LLC and Bruin E&P Operating, LLC, and Kraken Development III LLC.

Daniel T. Donovan (argued) and Ragan Naresh (appeared), Washington, DC, and Paul J. Forster (appeared), and Zachary R. Eiken (on brief), Bismarck, ND, for defendants Lime Rock Resources Operating Co., Inc. and Lime Rock Resources III-A, L.P.

Jeffrey C. King (argued) and Elizabeth L. Tiblets (appeared), Fort Worth, TX, and Ronald H. McLean (appeared) and Kasey D. McNary (on brief), Fargo, ND, for defendant Continental Resources, Inc.

Daniel M. McClure (appeared) and Rebecca J. Cole (appeared), Houston, TX, and Paul J. Forster (appeared) and Zachary R. Eiken (on brief), Bismarck, ND, for defendant EOG Resources, Inc.

Joshua A. Swanson, Fargo, ND, and George A. Barton, Overland Park, KS, for amicus curiae White River Royalties, LLC, and Sara Commack.

Mitchell D. Armstrong, Bismarck, ND, for amicus curiae North Dakota Petroleum Council.

Zachary E. Pelham, Bismarck, ND, and Bruce M. Kramer, Houston, TX, for amicus curiae American Petroleum Institute.

J. Scott Janoe, Macey Reasoner Stokes, Jason A. Newman, and Laura N. Shoemaker, Houston, TX, for amicus curiae Hess Bakken Investments II, LLC.

# Blasi v. Bruin E&P Partners
## Nos. 20200327-20200331

**Jensen, Chief Justice.**

[¶1]   Pursuant to Rule 47, N.D.R.App.P., the United States District Court for the District of North Dakota has certified to this Court the following question related to the interpretation of an oil and gas lease: "Whether the instant oil royalty provision is interpreted to mean the royalty is based on the value of the oil 'at the well.'" Blasi has filed a motion requesting that we decline to answer the question. We deny Blasi's motion and exercise our discretionary authority to answer the certified question. We conclude, as a matter of law, that the royalty provision in this case establishes a valuation point that is at the well. The answer to the certified question is "yes."

I

[¶2]   The Plaintiffs ("Blasi") sued the Defendants ("Bruin") in five separate cases in federal district court alleging Bruin underpaid royalties due under the terms of various oil and gas leases. Central to the parties' dispute is the interpretation of the following royalty provision:

> Lessee covenants and agrees:
>
> To deliver to the credit of the Lessor, free of cost, in the pipeline to which Lessee may connect wells on said land, the equal [fractional] part of all oil produced and saved from the leased premises.

[¶3]   Blasi accepts the royalties in cash rather than in kind. Blasi claims the royalty is to be paid "free of costs" and asserts Bruin improperly deducted "various costs such as gathering or moving the oil and other costs" from the marketable price of the oil. Bruin moved to dismiss the cases under Fed. R. Civ. P. 12(b)(6) arguing that Blasi's claims fail as a matter of law because the royalty oil is to be valued at the well, which allows for the deduction of post-production costs.

1

[¶4]   The federal district court has not decided Bruin's motion. It issued an order certifying the following question to this Court:

> Whether the instant oil royalty provision is interpreted to mean the royalty is based on the value of the oil "at the well."

The court found there is no controlling precedent in North Dakota and that a ruling by this Court may be determinative of the proceedings. The court also concluded the issue was "of some magnitude" in North Dakota, noting there are "at least six separate putative class action suits" in federal district court concerning the issue and one decision from the district where the court concluded a lessor in a similar case presented a plausible claim. *See White River Royalties, LLC v. Hess Bakken Invs. II, L.L.C.*, No. 1:19-cv-00218, 2020 WL 6231893, at *6 (D.N.D. May 22, 2020).

## II

[¶5]   The certified question requires a determination as to whether the lease establishes a royalty valuation point at the well or whether the valuation point is at some other place downstream. As crude oil travels through the stream of production, its value increases as costs are incurred to bring it to market. David E. Pierce, *The Renaissance of Law in the Law of Oil and Gas: The Contract Dimension*, 42 Washburn L.J. 909, 927 (2004). The work-back method, which this Court has adopted, accounts for those costs in a calculation to determine the royalty value of oil or gas at a point in the stream of production. *See Bice v. Petro-Hunt, L.L.C.*, 2009 ND 124, ¶ 20, 768 N.W.2d 496. Although we adopted the work-back method in the context of a royalty valuation point that was "at the well," parties to a lease are free to set a valuation point elsewhere. *See Kittleson v. Grynberg Petroleum Co.*, 2016 ND 44, ¶ 16, 876 N.W.2d 443 (the lease's language determines the royalty calculation); *Bice*, at ¶ 12 ("the terms of the lease . . . determine whether post-production costs are deductible prior to calculating the royalty"). Blasi claims the royalty provision in this case sets a valuation point somewhere downstream of the well where the oil enters a

2

pipeline. Bruin asserts the valuation point is at the well, where all reasonable post-production costs may be deducted.

## A

[¶6]   As a threshold matter, we must decide whether to answer the certified question. Rule 47, N.D.R.App.P., authorizes this Court to answer questions of law certified by a federal court when two conditions are met:  (1) the legal question "may be determinative of the proceeding," and (2) "there is no controlling precedent." In this case, if we determine the valuation point is at the well, the federal district court may dismiss the lawsuits because post-production costs would be deductible. The first condition is therefore met. The second condition is also met; there is no controlling precedent on the issue. Rule 47 authorizes us to answer the question.

[¶7]   Even when we are authorized to answer a certified question, our decision whether to do so is discretionary. *Mosser v. Denbury Res., Inc.*, 2017 ND 169, ¶ 8, 898 N.W.2d 406. We opt to exercise our discretionary authority to answer the question in this case. The oil and gas industry is significant in North Dakota. The specific language at issue has been used for many years. *See MacMaster v. Onstad,* 86 N.W.2d 36, 39-40 (N.D. 1957) (interpreting lease with nearly identical royalty provision). In addition, there are multiple putative class action lawsuits concerning this language pending in federal district court, and a decision by this Court would avoid the "pitfall of a divided federal district." *Bornsen v. Pragotrade, LLC*, 2011 ND 183, ¶ 10, 804 N.W.2d 55.

[¶8]   Blasi has filed a motion urging us to decline to answer the question because "discovery is needed to flesh out the facts before resolving the meaning of the disputed oil royalty clause." Blasi claims discovery is "particularly important" because the parties have advanced competing interpretations of the word "pipeline," and discovery will "provide the context and factual proof for what a pipeline is." Blasi also argues discovery will reveal the nature of the costs deducted by Bruin and allow us to

3

determine "whether these types of costs, or any costs, are deductible pre-pipeline."

[¶9]  We deny Blasi's motion. As we explain in Part II B, the language at issue is unambiguous and presents a question of law. We need not consider any extrinsic evidence to reach our holding. The exact meaning of the word "pipeline," and whether any specific pipe constitutes a "pipeline," is not dispositive of the issue. Nor is it necessary to know exactly which costs were deducted to interpret the royalty provision. No matter which costs were deducted, the valuation point will remain the same, and whether deduction of a certain cost was permissible can only be determined after a valuation point is established. We will therefore look to the language of the lease to interpret the provision.

B

[¶10] We apply the same general rules for interpreting contracts to our interpretation of oil and gas leases. *Hess Bakken Invs. II, LLC v. AgriBank, FCB*, 2020 ND 172, ¶ 8, 946 N.W.2d 746.

> "The construction of a written contract to determine its legal effect is a question of law. *Lire, Inc. v. Bob's Pizza Inn Restaurants, Inc.*, 541 N.W.2d 432, 433 (N.D. 1995). Contracts are construed to give effect to the mutual intention of the parties at the time of contracting. N.D.C.C. § 9-07-03; *Lire*, at 433-34. The parties' intention must be ascertained from the writing alone, if possible. N.D.C.C. § 9-07-04; *Lire*, at 434. A contract must be construed as a whole to give effect to each provision if reasonably practicable. N.D.C.C. § 9-07-06; *Lire*, at 434."

*Hess Bakken*, at ¶ 8 (quoting *Grynberg v. Dome Petroleum Corp.*, 1999 ND 167, ¶ 10, 599 N.W.2d 261). We will not consider extrinsic evidence when a lease is unambiguous and the parties' intent can be ascertained from the writing alone. *See Nichols v. Goughnour*, 2012 ND 178, ¶ 12, 820 N.W.2d 740. "[A] contract is ambiguous when reasonable arguments can be made

for different positions on its meaning." *Bakken v. Duchscher*, 2013 ND 33, ¶ 13, 827 N.W.2d 17 (quoting *Bendish v. Castillo*, 2012 ND 30, ¶ 16, 812 N.W.2d 398). Whether an ambiguity exists is a question of law. *Myaer v. Nodak Mut. Ins. Co.*, 2012 ND 21, ¶ 10, 812 N.W.2d 345.

[¶11] The oil royalty clause at issue states in full:

> Lessee covenants and agrees:
>
> To deliver to the credit of the Lessor, free of cost, in the pipeline to which Lessee may connect wells on said land, the equal [fractional] part of all oil produced and saved from the leased premises.

[¶12] The oil royalty clause requires the lessee "to deliver" a fraction of "all oil produced." In other words, it requires an in-kind delivery at a specified location. *See* Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What is the "Product"?*, 37 St. Mary's L.J. 1, 17 (2005) (delivery of oil "to the lessor's credit in a pipeline" constitutes an in-kind royalty clause). The provision specifies the location for the delivery—"in the pipeline to which lessee may connect wells on said land," and it establishes how the oil must be delivered to that location—"free of cost."

[¶13] Blasi claims the valuation location is independent of the well's location. Blasi argues the valuation point is "the pipeline." Blasi asserts "not all 'pipes' are 'pipelines,'" and the term "pipeline" does not refer simply to any pipe or tube connected to the well itself. Blasi emphasizes the article "the" in the phrase "the pipeline" and claims the term means a pipe used to transport oil to a refinery—the type that is "generally regulated by state or federal authorities for moving oil hundreds or thousands of miles, not a pipe between the wellhead and the tank battery to move oil a few feet." Blasi admits a gathering line would meet its definition of a pipeline.

5

[¶14] We need not look to any industry standard definition of a pipeline or parse the different types of pipes used in the oil and gas industry. The royalty provision itself identifies the pipeline that is contemplated. The meaning is based upon the pipeline's proximity to the wells, not its physical characteristics—it is "the pipeline to which the lessee may connect wells on said land." The use of "pipeline" in this context connotes a location in relation to the well; it does not designate a specific type of pipe as "the pipeline."

[¶15] Along with diminishing the meaning of the other language in the provision, Blasi's interpretation also introduces considerable uncertainty. Under Blasi's reading, the parties would have to examine the physical characteristics of various pipes to determine whether they are "the pipeline." Based on changes to infrastructure, the valuation point could shift over time. There is also a possibility that the oil may be transported by other means and never reach the type of commercial pipeline Blasi envisions. Blasi has not provided a rationale for why the parties would have bargained for this type of unpredictability.

[¶16] The plain language of the provision itself does not require the actual existence of a pipeline. It describes a pipeline the lessee "may" connect to the wells. Blasi reads the word "may" to constitute "an explicit permission so lessee 'may' bring a pipeline onto the land without the need to secure additional agreements." Blasi's interpretation would create a redundancy in the lease, which specifically provides for "rights of way and easements for laying pipe lines" in a different provision. A fair reading of the word "may" signifies the lessee cannot avoid the royalty obligation by neglecting to connect a pipeline to the wells. In other words, the royalty obligation exists regardless of whether the lessee constructs a pipeline at the described location.

[¶17] The location is at the "wells on said land." Blasi resists this interpretation based on a gas royalty provision in the lease that uses the

6

phrase "at the mouth of the well." Blasi argues that because this language is used elsewhere, the drafter must have meant something different in regard to the oil royalty provision, where the "at the mouth of the well" language was not used. While Blasi's argument has some merit, it is not dispositive and leaves unexplained why the parties would have contemplated a fixed and definite location for the valuation of the gas royalty and a valuation point for the oil royalty that could shift based on the method of transportation. A better explanation for the divergent language is that the clauses are different. They concern different resources based on different royalty delivery methods. The oil royalty requires in-kind distribution while the gas royalty requires an in-cash distribution.

[¶18] Blasi's interpretation would reword the oil royalty provision to say "free of cost in the pipeline." That reading disregards the words describing the contemplated location—i.e., the place where the lessee "may connect" a pipeline. That place is at the "wells on said land." The royalty provision is unambiguous. It establishes a valuation point at the well.

C

[¶19] Our interpretation is consistent with other jurisdictions that have interpreted similar provisions. In *Kretni Development Co. v. Consolidated Oil Corp.*, 74 F.2d 497, (10th Cir. 1934), a royalty provision required the lessee to "deliver to the credit of the lessors, . . . free of cost at the pipe lines, to which he may connect his wells, one-eighth part of the oil or gas produced and saved . . . or the proceeds derived from the sale of said one-eighth . . . ." *Id.* at 497. The well was connected to a pipeline and there was a dispute as to the royalty amount the lessee paid the lessor. *Id.* at 499. The trial court determined the royalty gas was valued and sold "at the connection with the pipeline in the field." *Id.* at 500. The Tenth Circuit Court of Appeals affirmed explaining the parties "certainly could not reasonably have contemplated that the lessee . . . would provide [the gas] to a far removed

7

point of consumption and that they would share in the common ownership of the gas until it reached that destination and was sold there." *Id.* at 499.

[¶20] In *Molter v. Lewis*, 134 P.2d 404, 404-05 (Kan. 1943), a royalty provision required the lessee "[t]o deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises." There was no pipeline connected to the well. *Id.* at 405. The oil, including the royalty oil, was transported by truck to be sold. *Id.* The Supreme Court of Kansas held transportation fees were deductible explaining:

> It is the duty of the lessee to see that the oil is marketed, but this general duty does not mean that the lessee must pay the transportation charge of the lessee's share of the oil from the well to some distant place. *His contract is to deliver the oil to the lessor at the well.*

*Id.* at 406 (emphasis added).

[¶21] In a more recent case, *Burlington Resources Oil & Gas Co. v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 201 (Tex. 2019), the Supreme Court of Texas interpreted an overriding royalty provision that required delivery "into the pipeline, tank or other receptacle to which any well or wells on such lands may be connected, free and clear of . . . all costs and expenses." The royalty holder took its royalty payments in cash and not in kind. *Id.* at 202. The trial court held the provision did not allow for deduction of post-production costs. The Supreme Court of Texas reversed explaining the provision contemplates delivery at the well. *Id.* at 207. The court provided a comprehensive summary of various treatises on the issue:

> [S]everal authors familiar with industry practices seem to agree with Burlington that a provision for delivery "into the pipeline" contemplates valuation at the well and therefore authorizes deduction of post-production costs. One treatise states that under an agreement "providing for delivery 'free of cost *in the*

8

*pipe line* to which Operator may connect his wells,' the expense of transportation or of treating oil or gas or of compressing gas to make it deliverable must be shared by the owner of the nonoperating interest." This language "suggests that the parties assumed that a pipe line connection at the well would be available," and the lessor's [Sic] duties "will not include the burden of bearing the expense of treating, compressing or transporting [the nonoperator's] share of production." 3 HOWARD R. WILLIAMS & CHARLES J. MYERS, OIL AND GAS LAW § 646.2 (Patrick H. Martin & Bruce M. Kramer, eds., 2018) (footnote omitted). Another treatise noted, as a general matter, "[i]f the royalty clause provides for delivery of royalty gas to the lessor's credit free of cost in the pipeline to which the well is connected, the parties contemplate a delivery of royalty gas at the well." 3 EUGENE KUNTZ, TREATISE ON THE LAW OF OIL AND GAS § 40.5(a) (1989). Another commentator similarly recognized an equivalence between "in the pipe line" and "at the wells" clauses, noting that "some leases provide that the royalty oil may be delivered in the pipe line to which the wells may be connected, 'or at the wells,' or 'into storage tanks.' It would seem, under this clause, that the lessee's obligations are at an end when he has made a delivery at the place designated, and that the expense of storage and transportation thenceforth must be borne by the lessor." A. W. Walker, Jr., *Nature of the Property Interests Created by an Oil and Gas Lease in Texas*, 10 TEX. L. REV. 291, 313 (1932).

*Id.* at 207-08 (alteration in original). *See also BlueStone Nat. Res. II, LLC v. Nettye Engler Energy, LP*, No. 02-19-00236-cv, 2020 WL 3865269, at *4-5 (Tex. App. July 9, 2020) (discussing *Burlington* and explaining a deed's "use of the phrase 'in the pipeline' effectively sets the valuation point at the wellhead").

## III

[¶22] We deny Blasi's motion requesting that we decline to answer the question. We hold, as a matter of law, that the oil royalty provision in this

case unambiguously sets a valuation point at the well. The answer to the certified question is "yes."

[¶23] Jon J. Jensen, C.J.
       Daniel J. Crothers
       Lisa Fair McEvers
       Jerod E. Tufte

[¶24] The Honorable David W. Nelson, S.J., sitting in place of VandeWalle, J., disqualified.

**David W. Nelson, S.J., dissenting.**

[¶25] I respectfully dissent. At this stage of the proceedings, I believe the parties should be allowed to conduct discovery before this Court decides the certified question on the disputed oil royalty provision. I would grant the Blasi Plaintiffs' motion to decline to answer the certified question at this time.

[¶26] Under N.D.R.App.P. 47, this Court's power to answer a certified question of law from a federal district court is discretionary. *See* N.D.R.App.P. 47 (explanatory note); *Mosser v. Denbury Res., Inc.*, 2017 ND 169, ¶ 8, 898 N.W.2d 406. Rule 47 provides, in relevant part:

> (a) Power to Answer. The supreme court may answer questions of law certified to it by the United States Supreme Court, a court of appeals of the United States, a United States district court, or the highest appellate or intermediate appellate court of any other state, when requested by the certifying court and the following conditions are met:
>
> > (1) questions of law of this state are involved in any proceeding before the certifying court which may be determinative of the proceeding;

(2) it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state.

(b) Method of Invoking. This rule may be invoked by an order of any of the courts referred to in subdivision (a) upon the court's own motion or upon the motion of any party to the proceeding.

(c) Contents of Certification Order. A certification order must contain:

(1) a question of law formulated in a manner allowing the question to be answered by a "yes" or "no";

(2) *a statement of all facts relevant to the question certified, showing fully the nature of the controversy in which the question arose*;

(3) a statement demonstrating there is no controlling precedent in the decisions of the supreme court.

(Emphasis added.)

[¶27] The explanatory note to N.D.R.App.P. 47 makes clear that "[t]he statement of facts in a certification order should present all of the relevant facts. The purpose is to give the answering court a complete picture of the controversy so that the answer will not be given in a vacuum." *Id.* In *Bornsen v. Pragotrade, LLC*, 2011 ND 183, ¶ 26, 804 N.W.2d 55 (Kapsner, J., dissenting), Justice Kapsner in her dissent warned about deciding a certified question with an undeveloped record and without having all of the relevant facts:

[T]his Court should not be asked to answer the [certified] question without the benefit of knowing those facts. Doing so "exposes the judiciary to the danger of improvidently deciding issues and of not sufficiently contemplating ramifications of the opinion," which Justice Crothers has cautioned against in another context. *Sandberg v. Am. Family Ins. Co.*, 2006 ND 198,

11

¶ 20, 722 N.W.2d 359 (Crothers, J., concurring specially). While we must appreciate the deference shown to the development of state law by the certification of state law questions, an undeveloped record creates risks of unintended consequences. Under facts which are totally unknown to this Court, the opinion and the subsequent development of this case in the federal courts may be taken for an application of North Dakota law which strains our statute.

[¶28] In moving this Court to decline to answer the certified question, the Blasi Plaintiffs contend the certified question is premature because the federal district court case is at the pleading stage and no discovery has occurred. They argue certifying the question before any discovery has been conducted and before class certification might lead to unintended consequences and improvident results. The Blasi Plaintiffs contend discovery is necessary because the parties have advanced competing interpretations of the term "pipeline," as that term is used in the oil royalty provision at issue. They further assert that discovery would provide the requisite context and factual proof to show what a "pipeline" is and that discovery would also reveal the nature of the various costs deducted by the Defendants before the oil enters the pipeline.

[¶29] Here, the majority opinion decides that answering the certified question under N.D.R.App.P. 47 is appropriate and that any discovery is unnecessary because the oil royalty provision at issue is unambiguous and presents a question of law. I believe, however, discovery should be conducted to ensure a complete and full factual record has been developed "showing fully the nature of the controversy," as contemplated under the rule.

[¶30] To be sure, this Court has long held that "[i]f the parties' intentions can be ascertained from the writing alone, without reference to extrinsic evidence, then the interpretation of the contract is entirely a question of law." *Thompson v. Thompson*, 391 N.W.2d 608, 610 (N.D. 1986) (quoting

*Bohn v. Johnson*, 371 N.W.2d 781, 788 (N.D. 1985)). Although extrinsic evidence is generally not allowed when language is unambiguous, this Court has also said that a latent ambiguity "may, in limited circumstances, be explained by extrinsic evidence." *Goodall v. Monson*, 2017 ND 92, ¶ 9, 893 N.W.2d 774 (quoting *Gawryluk v. Poynter*, 2002 ND 205, ¶ 10, 654 N.W.2d 400). "A latent ambiguity is one 'arising when a writing appears unambiguous on its face, but some collateral matter makes the meaning uncertain.'" *Id.*; *see also Black's Law Dictionary* 100 (11th ed. 2019) (defining "latent ambiguity" as "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter once the document's terms are applied or executed.").

[¶31] In *West v. Alpar Res., Inc.*, 298 N.W.2d 484, 490 (N.D. 1980), this Court also explained that under N.D.C.C. § 9-07-19, in cases of uncertainty, a contract's language should be interpreted "most strongly against the party who caused the uncertainty to exist." "An ambiguity exists under a contract when good arguments can be made for either of several contrary positions as to the meaning of a term." *West*, at 490. (citing *Kruger v. Soreide*, 246 N.W.2d 764 (N.D. 1976)). In *West*, the Court agreed with the following proposition for construing an oil and gas lease when an ambiguity exists:

> Construction of oil and gas leases containing ambiguities is in favor of the lessor and against the lessee for the reason that the lessee usually provides the lease form or dictates the terms thereof and if such lessee is desirous of more complete coverage, the lessee has the opportunity to protect itself by the manner in which its draws the lease.

298 N.W.2d at 490-91 (quoting *Gilmore v. Superior Oil Co.*, 388 P.2d 602, 603 (Kan. 1964)) (quotation marks omitted).

[¶32] The majority opinion concludes the factual circumstances of what constitutes a "pipeline" is not dispositive of the issue, but I believe that discovery would provide necessary insight into the parties' intentions and

13

understanding of the oil royalty provision at the time the various leases were executed. Although the majority opinion concludes the provision's language is unambiguous, this Court may simply not have the record necessary to show "fully the nature of the controversy," including any potential collateral matter relating to the "pipeline" contemplated by the oil royalty provision.

[¶33] Allowing the parties to conduct discovery would permit the court to actually find out what representations were made by those who created the leases and what the lessors understood those provisions to mean. Discovery might also reveal whether any Defendants have taken any positions contrary to their interpretation of the oil royalty provision presently put forth. While this is a very important question, I am left with many questions as to the history and actual practice in the industry. I would therefore send the cases back to the federal district court for discovery.

[¶34] For the foregoing reasons, I would grant the Blasi Plaintiffs' motion to decline to answer the certified question at this time.

[¶35] David W. Nelson, S.J.